The Honorable Thomas S. Zilly

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| DUY T. MAI,<br><br>Plaintiff,<br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Case No. 2:24-cv-01102-TSZ<br><br>UNITED STATES' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT<br><br>Noted for Consideration:<br>December 19, 2025<br><br>***FILED UNDER SEAL*** |

## I. INTRODUCTION

At the time of the Founding and continuing through the centuries, legislatures, acting on a categorical basis, barred groups of individuals who were deemed dangerous from keeping and bearing arms. Section 922(g)(4) of Title 18, which prohibits possession of a firearm by any person who "has been adjudicated as a mental defective or who has been committed to a mental institution," follows that tradition. In the colonial and founding era, the government had the power to imprison or institutionalize mentally ill individuals who were thought dangerous. Those individuals had few due process rights and no access to firearms. As American society expanded and transformed, the mentally ill were hospitalized, rather than imprisoned. They were also granted



**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

due process rights that might permit their release even when they still posed some chance of danger if given access to firearms. Section 922(g)(4)'s prohibition on firearm possession by those individuals who were previously involuntarily committed is relevantly similar and analogous to the historical tradition of firearms bans for the mentally ill and for other categories of individuals who may be dangerous but who have been released back into free society, such as past felons and those presently charged with crimes.

In 1999, Plaintiff Duy T. Mai was committed involuntarily, for more than nine months, to a mental institution after a Washington state court found him to be both mentally ill and dangerous. Dkt. 21, pgs. 12-16. He has since had his firearms rights restored under state law but contends that § 922(g)(4) is unconstitutional as applied to him and violates his rights under the Second Amendment. He is wrong.[1]

Section 922(g)(4) is not susceptible to an as-applied challenge—it is constitutional in all its applications because, "consistent with our historical tradition, the government is empowered to regulate guns through categorical restrictions." *United States v. Duarte*, 137 F.4th 743, 761 (9th Cir. 2025) (en banc). Section 922(g)(4) not only stems from a robust tradition of prohibiting gun possession by those who are mentally ill but also fits squarely within the regulatory principle in this nation's historical tradition of firearm regulation that legislatures may categorically disarm those "deemed dangerous." *Id.* at 759. The statute reflects Congress's reasonable determination that those who were committed involuntarily years ago—even if they are not currently suffering from a mental illness—present "a special danger of misuse" of firearms. *United States v. Rahimi*, 602 U.S. 680, 698 (2024). But to the extent that this Court finds as-applied analysis appropriate,

[1] Mai litigated this claim in federal court once before and lost. *See Mai v. United States*, 952 F.3d 1106 (9th Cir. 2020). He has filed a new declaratory action because the Supreme Court has since changed the methodology for analyzing Second Amendment claims. *See N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022).



**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

§ 922(g)(4) is constitutional as applied to Mai, who was found, through procedures satisfying due process, *actually* dangerous in the past. And if Mai believes that he is no longer "likely to act in a manner dangerous to public safety" and that restoring his gun rights "would not be contrary to the public interest," 18 U.S.C. § 925(c), he will soon have available to him a process to apply directly to the Attorney General for relief—a more workable process for restoring firearms rights than a new, court-administered regime of as-applied challenges. The pending revitalization of § 925(c) shows that Mai's disarmament under § 922(g)(4) will no longer necessarily be permanent. The Court should deny Mai's motion for summary judgment, grant the government's cross-motion for summary judgment in favor of the United States, and dismiss this action.

## II. STATEMENT OF FACTS

### A. Early Psychiatric History (1999–2000)

In fall 1999 at age 17, while attending Mariner High School, [redacted]. As a result, the Snohomish County Sheriff's Office detained him for treatment. Morris Decl., Ex. B, pg. 1.

In the initial evaluation, Mai told the interviewing officer [redacted]



**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

[redacted]

[redacted]

In the same interview, Mai told a Snohomish County Sheriff officer [redacted]

Following the initial interview, the Snohomish County Sheriff's officers took Mai to [redacted]

At one time, Mai was returned to inpatient treatment because [redacted]

---

[redacted]



**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

[redacted]

[redacted] A week later, a stipulated order between the Snohomish County Prosecutor's Office and Mai's counsel extended Mai's involuntary treatment for an additional 180 days. Dkt. 21, pgs. 12-16. [redacted]

**B. Psychiatric Testing and DSM-IV Diagnoses**

*i. Mai's Psychological Testing*

[redacted]

The admitting psychiatrist's DSM-IV diagnoses were: [redacted]



**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

[redacted]



**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]



**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

[redacted]

**C. Later Psychiatric History (2003)**

Mai's mental health problems continued after high school. In February 2003, while a student at the University of Washington, Mai [redacted]

Mai also reported [redacted]

Despite these admissions, Mai was described as [redacted]



**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

[redacted]

[redacted]

**D. Firearm Rights Proceedings (2014–present)**

In 2004, Mai attempted to purchase a firearm from a pawn shop in Everett, Washington. Ex. E, pgs. 3-4. He failed the background check. *Id.*

After University of Washington, Mai attended graduate school in California. In approximately 2007, Mai again attempted to purchase a firearm. Ex. E, pg. 3. Mai had read that in the state of California, if five years had passed without mental health commitments, gun restrictions would be lifted. Ex. A, 41:23-42:25. However, the federal restriction remained, so his purchase was denied.

In 2014, Mai petitioned a Washington state court to restore his firearm rights. Dkt. 21, pgs. 4-11. He testified that he underwent forensic evaluations by two psychologists and his physician, collected fourteen character-statements, and submitted a workplace safety report. *Id.* The state court restored his firearm rights under Washington law. Dkt. 21, pgs. 30-31.

In 2015, the Bureau of Alcohol, Tobacco, Firearms and Explosives advised Mai that his state restoration order did not satisfy federal requirements. Ex. A, 46:7-15. Despite this, Mai again tried to purchase a firearm in 2015. Ex. A, 43:4-44:4. During this attempt, Mai did not disclose to

---

[redacted]



**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

the seller on the questionnaire that he was under a mental health restriction. Ex. A, pg. 45:3-20. The seller denied Mai's purchase based on his background check. Ex. A, pg. 45:16-20.

Mai's stated reasons for seeking to own firearms are hunting, historical collecting, and self-defense against wild animals while hiking. Ex. E, pg. 4; Ex. A, 47:25-48:24. According to him, he went hunting once in Vietnam as a child. Ex. A, 48:21-11.

## III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The nonmoving party must then present specific facts showing a genuine issue for trial. *Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 927-28 (9th Cir. 2009). The "nonmoving party must introduce some significant probative evidence tending to support the complaint." *Rivera v. Nat'l R.R. Passenger Corp.*, 331 F.3d 1074, 1078 (9th Cir. 2003). "Conclusory allegations unsupported by factual data" are not enough. *Id*. "If the evidence is merely colorable, or is not significantly probative," summary judgment is warranted. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 249-50 (1986) (internal citation omitted).

Here, there are no disputes as to any of the underlying facts in the case. The question, then, is which party is entitled to judgment as a matter of law. As discussed below, the United States has established such an entitlement while Mai fails to do so.

## IV. ARGUMENT

### A. The methodology for analyzing Second Amendment claims

The Second Amendments reads: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Second Amendment "secures for Americans a means of self-defense" and is



**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

fundamental. *Rahimi*, 602 U.S. at 690. But the right is not unlimited and "was never thought to sweep indiscriminately." *Id.* It is "'not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'" *Id.* (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)).

To determine whether a statute such as 18 U.S.C. § 922(g)(4) violates the Second Amendment, courts must "first consider whether the Amendment's plain text covers an individual's proposed course of conduct." *United States v. Perez-Garcia*, 96 F.4th 1166, 1178 (9th Cir. 2024). "If so," the next question is whether the government can "justify[] the regulation by showing that it is consistent with our nation's 'historical tradition of firearm regulation.'" *Id.* (quoting *Bruen*, 597 U.S. at 24). The Supreme Court announced this two-step standard in *Bruen* in 2022. *Id.* This supplanted the framework—combining history with means-end scrutiny—that the Courts of Appeals had previously applied. *Id.* at 17.

In *Rahimi*, the Supreme Court clarified the "methodology of our recent Second Amendment cases." 602 U.S. at 690. To show that a statutory prohibition is consistent with our nation's historical tradition of firearm regulation, the government need not point to a Founding-Era law that is a "'dead ringer' or a 'historical twin'" to the challenged regulation. *Id.* at 692 (quoting *Bruen*, 597 U.S. at 30). Rather, the government must show that "the challenged regulation is consistent with the *principles* that underpin our regulatory tradition" and faithfully applies the "'balance struck by the founding generation to modern circumstances.'" *Id.* (emphasis added, quoting *Bruen*, 597 U.S. at 29). The government need only show that the challenged regulation is "'relevantly similar' to laws that our tradition is understood to permit." *Id.* (citing *Bruen*, 597 U.S. at 26-31). The modern and historical laws are relevantly similar, or analogous, if they share "[w]hy[s] and how[s]"—that is, if they are aimed at addressing similar problems, and burden the right to bear arms to a similar extent. *Id.*



**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

*Rahimi* employed this methodology to reject a facial challenge to 18 U.S.C. § 922(g)(8)(C)(i), which prohibits a person subject to a domestic violence restraining order from possessing a firearm. *Id.* The Supreme Court had "no trouble concluding" that this prohibition fit within "[o]ur tradition of firearm regulation allow[ing] the Government to disarm individuals who present a credible threat to the physical safety of others." *Rahimi*, 602 U.S. at 700. The Court concluded that there is a historical tradition of disarming, "through ordinary criminal laws and civil actions," persons "who physically threatened others." *Id.* at 694. Surety law "provided a mechanism for preventing violence before it occurred," and "going armed laws" (codified or common-law) "punish[ed] those who had menaced others with firearms," and "specifically addressed firearms violence." *Id.* at 695-98, 701. Additionally, the going armed laws, "a particular subset of the ancient common-law prohibition on affrays," punished conduct that "disrupted the 'public order'" and which 'le[d] almost necessarily to actual violence'" with the forfeiture of arms and imprisonment. *Id.* at 697 (internal citations omitted).

The Supreme Court acknowledged that § 922(g)(8)(C)(i) "is by no means identical to these founding era regimes" of surety and going armed laws but explained that "*it does not need to be*." *Id.* at 698 (emphasis added). Instead, what matters is that § 922(g)(8)(C)(i) is "'relevantly similar'" to those laws "in both why and how it burdens the Second Amendment right." *Id.* Moreover, the Court emphasized that, while § 922(g)(8)(C)(i)'s requirement of a court finding that a specific defendant poses a credible threat particularly matched "the surety and going armed laws," such individual judicial determinations were not necessary to a regulation's constitutionality. *Id.* at 699. "[W]e do not suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse." *Id.* at 698 (citing *Heller*, 544 U.S. at 626). The Court reiterated its prior opinion that prohibitions "like those on the possession of firearms by 'felons and the mentally ill,'" are



**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

'presumptively lawful.'" *Id.* at 699 (quoting *Heller*, 544 U.S. at 626, 627 n.26); *see also Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring); *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality opinion).

Building upon this foundation, the Ninth Circuit sitting en banc recently held that our nation's "historical tradition reveals that legislatures were permitted to categorically disarm those they deemed dangerous without having to perform an individualized determination of dangerousness as to each person in a class of prohibited persons." *Duarte*, 137 F.4th at 760 (cleaned up). On that basis,[5] the court rejected an as-applied challenge to 18 U.S.C. § 922(g)(1), which prohibits gun-possession by those previously convicted of felonies. *Duarte*, 137 F.4th at 761 (the "historical tradition is sufficient to uphold the application of § 922(g)(1) to *all* felons" (emphasis added)).

*Duarte* concluded that the "historical record reveals a host of regulations that disarmed those whom legislatures deemed dangerous on a categorical basis." *Id.* at 759. It discussed pre-Founding laws disarming those who were "dangerous to the Peace of the Kingdom"; colonial restrictions imposed upon Catholics, Native Americans, slaves and free Black people, and those who during the revolutionary period "refused to swear oaths of loyalty to the emerging nation"; and laws promulgated "through the late 1800s" imposing "categorical restrictions on the possession of firearms by certain groups of people," including those "below specified ages," those of "unsound mind," those "who were intoxicated," and "certain vagrants." *Id.* at 759-60. The court acknowledged that those laws "reflect overgeneralized and abhorrent prejudices that would not survive legal challenges today," but that nevertheless the laws "are reflective of American history

[5] The court also recognized the historical regulatory principle that "legislatures may disarm those who have committed the most serious crimes." *Id.* at 755. But it made clear that "*either*" principle "supplies a basis for the categorical application of § 922(g)(1) to felons." *Id.* (emphasis added); *see also id.* at 761. The "deemed dangerous" principle is the most relevant to the analysis of § 922(g)(4), so it is the principle the government focuses on here.



**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

and tradition" and "reveal[] that legislatures were permitted" to categorically disarm those deemed dangerous without individualized determinations. *Id.* at 760.

Notably, Mai's motion for summary judgment fails to discuss or acknowledge *Duarte*. *Duarte*'s analysis, however, compels the conclusion that § 922(g)(4)—which clearly reflects a legislative determination as to the categorical dangerousness of those who have been previously involuntarily committed—is constitutional in all its applications.

Since Mai filed his motion, the Ninth Circuit has also decided *United States v. Stennerson*, 150 F.4th 1276 (9th Cir. 2025). There, the court upheld 18 U.S.C. § 922(g)(3), which prohibits firearm possession by any person "who is an unlawful user of or addicted to any controlled substance." *Id.* at 1279-80. The defendant in *Stennerson* raised only a facial challenge to the statute, so the court left "for another day" the issue of whether § 922(g)(3), like § 922(g)(1), "is also categorically constitutional." *Id.* at 1285. But in concluding that § 922(g)(3) is constitutional on its face, the court stressed that a modern law "need not be a dead ringer or a historical twin," and that in assessing "whether a modern law is sufficiently analogous to historical regulation," courts "do not isolate each historical precursor and ask if it differs from the challenged regulation in some way." *Id.* at 1283 (cleaned up). And the court referenced a wide range of historical laws disarming those who pose "a clear threat of physical violence to another," those judged "dangerous to the Peace of the Kingdom," "disaffected persons," and "intoxicated persons." *Id.* at 1283-85.

*Stennerson* also upheld 18 U.S.C. § 922(n), which makes it "unlawful for any person who is under [a felony] indictment . . . to . . . receive any firearm or ammunition." *Id.* at 1288-90. The court cited *Perez-Garcia*, 96 F.4th 1166, and *Duarte* for much of its analysis, and explained that both cases stand for the proposition that "legislatures could disarm groups of people without individualized determination" and were "permitted to categorically disarm those they deemed dangerous." *Id.* at 1289 (cleaned up).



**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

**B. 18 U.S.C. § 922(g)(4)**

In the Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213, Congress enacted restrictions on the possession of firearms by certain classes of individuals. The restriction at issue here prohibits possession of a firearm in or affecting commerce by any person who "has been adjudicated as a mental defective or who has been committed to a mental institution." 18 U.S.C. § 922(g)(4). Federal regulations make clear that the prohibition does not apply to "a person in a mental institution for observation or a voluntary admission to a mental institution." 27 C.F.R. § 478.11. The statute does not bar every person who has suffered from mental illness from possessing a firearm—rather, "its reach is limited to those instances in which an independent court, board, commission, or other lawful authority has determined that the individual poses a sufficient risk of danger to themselves or others that renders temporary confinement, against the person's will, necessary." *United States v. Gould*, 146 F.4th 421, 428 (4th Cir. 2025) (concluding that § 922(g)(4) is facially constitutional). "Involuntary commitments comport with due process only when the individual is found to be *both* mentally ill *and* dangerous." *Mai*, 952 F.3d at 1110 (citing *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992)). And commitments under state-law procedures that "lack robust judicial involvement do not qualify as commitments" under § 922(g)(4). *Id.* (citing *United States v. Rehlander*, 666 F.3d 45, 47-49 (1st Cir. 2012)).

Congress permits states that meet certain requirements to grant relief from § 922(g)(4)'s firearm ban. *See* 34 U.S.C. § 40915. A state's process suffices if it (1) "allows a person to apply for relief" (2) "before a state court, board, or commission that will determine—consistent with principles of due process—whether 'the person will not be likely to act in a manner dangerous to public safety and that the granting of relief would not be contrary to the public interest'" and (3) "provides for de novo judicial review of a denial of a petition." *Gould*, 146 F.4th at 424 (quoting § 40915(a)). Thirty-three states and one territory have established such processes, *id.* at 424 & n.5,



**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

but Washington's program, set forth in Revised Code of Washington 9.41.047(3), does not qualify.[6] *See Mai*, 952 F.3d at 1111-12.

Until 1992, Congress also allowed an individual to obtain relief from § 922(g)(4)'s bar to possessing a firearm by demonstrating to the Attorney General that "the circumstances regarding the disability, and [his] record and reputation, are such that [he] will not be likely to act in a manner dangerous to the public safety and that the granting of the relief would not be contrary to the public interest." 18 U.S.C. § 925(c). The Attorney General delegated that restoration power to the Director of ATF. 27 C.F.R. § 478.144 [Reserved]. Since 1992, however, Congress had effectively suspended this provision by prohibiting the use of federal funds to process § 925(c) relief applications. *See Logan v. United States*, 552 U.S. 23, 28 n.1 (2007).

As will be discussed further below, the Attorney General is in the process of promulgating rules to once again give full effect to § 925(c). Those, like Mai, who are currently barred from firearm possession under § 922(g)(4) thus will soon be able to apply to the Attorney General for relief from federal firearms disabilities.

**C. The constitutionality of § 922(g)(4) is supported both by this nation's history of disarming those who are mentally ill and its tradition of categorically disarming those a legislature has deemed dangerous**

***1. The historical tradition of disarming the mentally ill supports § 922(g)(4)***

American society has long used a host of legal mechanisms to prevent the mentally ill from accessing firearms. *See Mai*, 952 F.3d at 1114 ("[H]istorical evidence supports the view that society did not trust the mentally ill with the responsibility of bearing arms."); *cf. Gould*, 146 F.4th at 428-30 (reviewing the historical tradition of incapacitating those suffering from mental illness). Even before the Founding, for example, the Vagrancy Act of 1744 allowed justices of the peace

[6] Accordingly, it is undisputed that Mai cannot benefit under 34 U.S.C. § 40915, despite the restoration of his firearm rights under state law. *See* Dkt. 20 at 4.



**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

in England to lock up and seize the property of those "who by Lunacy … are furiously mad, or are so far disordered in their Senses that they may be dangerous." 17 Geo. 2, c. 5 (capitalization altered); Richard Moran, *The Origin of Insanity as a Special Verdict: The Trial for Treason of James Hadfield (1800)*, 19 Law & Soc'y Rev. 487, 509-510 (1985). A "lunatic" could include a person who "hath lucid intervals; sometimes enjoying his senses, and sometimes not." 1 William Blackstone, *Commentaries on the Laws of England* 294 (1765); *see also* Edward Coke, *The First Part of the Institutes of the Lawes of England, or, a Commentarie upon Littleton* § 405, at 247 (1628).

Likewise, in pre-Founding and Founding-era America, those who had become affected with mental illnesses "were generally treated as if they had been … [s]tripped of all … their rights and privileges." Albert Deutsch, *The Mentally Ill in America: A History of their Care and Treatment from Colonial Times* 41 (1949). Some colonies authorized justices of the peace to "lock[] up" lunatics considered "dangerous to be permitted to go abroad." Henry Care, *English Liberties, or the Free-Born Subject's Inheritance* 329 (6th ed. 1774). "It should come as no surprise that confinement did not include access to guns." *United States v. Veasley*, 98 F.4th 906, 913 (8th Cir. 2024).

Around the time of the Second Amendment's ratification, several states had enacted laws that permitted the commitment of persons determined by justices of the peace, magistrates, or selectmen to be "[l]unatics" or of "unsound mind." *See, e.g.*, 1769 Va. Act 13; 2 William Littell, *The Statute Law of Kentucky* 578 (1810) (referencing statute of 1787); 1 Samuel Shepherd, *Statutes at Large of Virginia from October Session 1792, to December Session 1806, Inclusive* 163 (1835) (1792 law); 1798 Mass. Act 813; 1 *The Public Statute Laws of the State of Connecticut* 386 (1808) (1793 law). Governing officials under these and other provisions had "a lot of discretion when deciding whether to confine the mentally ill." *Veasley*, 98 F.4th at 914.



**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

Colonial America "lacked large urban areas and complex institutional arrangements characteristic of" England. Gerald N. Grob, *The Mad Among Us: A History of the Care of America's Mentally Ill* 5, 13-14 (1994). Some areas lacked even "the luxury of a jail." Deutsch, *supra*, at 41. Because the "proportionately small number of 'distracted' persons did not warrant the creation of special facilities," persons with mental illness initially "were cared for on an ad hoc and informal basis." Grob, *supra*, at 6. The first general hospital in colonial America did not open until the 1750s, while the first asylum dedicated to the care of the mentally ill opened in Williamsburg in 1773. Deutsch, *supra*, at 58-60; Grob, *supra*, at 18-20. Given these societal conditions, early "legislation usually concerned itself more with [the mentally ill person's] property than their person." Deutsch, *supra*, at 53; *see also* Mary Ann Jimenez, *Changing Faces of Madness: Early American Attitudes and Treatment of the Insane* 51 (1987). It was not until the 19th century that a "dramatic growth in population" caused mentally ill persons to be "more visible, and public concern about security increased." Grob, *supra*, at 24.

As relevant societal conditions changed, so did the nature and specificity of mental-illness related firearms regulations. As the nineteenth century progressed, several states banned the sale of guns to the mentally ill. *See* 1881 Fla. Laws 87; 1883 Kan. Sess. Laws 159; 1899 N.C. Pub. Laws 202-1; *see also* Sam Kimble, *Revised Ordinances of the City of Manhattan and Rules of the Council* 49 (1887). In the twentieth century, more regulations restricting the delivery or sale of firearms were extended to the mentally ill. *See, e.g.*, 1927 N.J. Laws 745; 1931 Pa. Laws 499; 1935 Ind. Act 161; 1935 S.D. Sess. Laws 356; 1935 Wash. Sess. Laws 601; 1936 Ala. Acts 52; 47 Stat. 650, 652 (1932). Today, every state but New Hampshire imposes some sort of restriction on gun possession by persons who have suffered from mental illness. *See* https://www.ncsl.org/civil-and-criminal-justice/possession-of-firearmsby-people-with-mental-illness (last visited Sept. 5, 2025). Given this body of American law, "longstanding prohibitions on the possession of firearms"



**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

by the mentally ill have a well-established "historical tradition." *Heller*, 554 U.S. at 626-27; *see also Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring).

In his motion for summary judgment, Mai asserts that "scholars have searched in vain through eighteenth-century records to find any laws specifically excluding the mentally ill from firearms ownership." Dkt. 20 at 7 (quoting *Mai v. United States*, 974 F.3d 1082, 1089 (9th Cir. 2020) (Bumatay, J., dissenting from denial of rehearing en banc)). Regardless of whatever support Mai thanks a dissent provides, that dissent was written before *Bruen* explained the methodology for analyzing Second Amendment claims and before *Rahimi* made clear that the government need not point to a "'dead ringer' or a 'historical twin.'" 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 30). Applying *Bruen* and *Rahimi*, Judge Bumatay's dissent does not call into question this "'relevantly similar'" historical tradition of limiting firearms possession by the mentally ill.[7] *Rahimi*, 602 U.S. at 692 (citing *Bruen*, 597 U.S. at 26-31).

***2. Categorical disarmament of those deemed dangerous supports § 922(g)(4)***

The foregoing shows the well-established historical tradition of disarming the mentally ill. However, as the Fourth Circuit recently explained in *Gould*, and as Mai argues, the phrase "mentally ill" "logically describes those *currently* experiencing mental illness," while § 922(g)(4) includes not just mentally ill persons, but those who have been "involuntarily committed for a mental illness and [have] recovered." 146 F.4th at 426. Yet courts need not "subscribe to the notion that 'once mentally ill, always so'" to find that § 922(g)(4) is constitutional even as to this second group. *Mai*, 952 F.3d at 1121. Comparing the "how[s]" (disarmament on pain of incarceration)

[7] The Fourth Circuit in *Gould* rejected an argument identical to Mai's, explaining that the relative dearth of eighteenth-century laws excluding the mentally ill from firearms ownership is "largely because the mentally ill were at the time 'cared for on an ad hoc and informal basis either by the family or community.'" 146 F.4th at 428 (quoting Grob, *supra*, at 6). "In any event, the lack of historical laws specifically disarming the mentally ill isn't the final word. After all, laws restricting firearm ownership aren't 'trapped in amber.'" *Gould*, 146 F.4th at 428 (quoting *Rahimi*, 602 U.S. at 691).



**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

and "why[s]" (the underlying societal problem sought to be addressed) of modern and historical laws, § 922(g)(4) is relevantly similar to a host of historical laws designed to prevent violence "by those found to pose an increased risk of danger to the community or themselves," *i.e.*, those deemed dangerous. *Gould*, 146 F.4th at 428. And *Duarte* makes clear that § 922(g)(4) fits comfortably within this nation's tradition of categorically disarming those that a legislature has "deemed dangerous." *See Duarte*, 137 F.4th at 759-61.

The Ninth Circuit has explained that the Second Amendment "allows categorical bans on groups of persons who presently pose an increased risk of violence," and that Congress reasonably determined that, "like felons and domestic-violence assailants, those who have been involuntarily committed to a mental institution also pose an increased risk of violence."[8] *Mai*, 952 F.3d at 1116-17. The principal purpose of the Gun Control Act, which enacted § 922(g)(4), was to "c[ur]b crime by keeping 'firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency.'" *Huddleston v. United States*, 415 U.S. 814, 824 (1974) (quoting S. Rep. No. 90-1501, at 22, *available at* 1968 U.S.C.A.N.N. 4410). Congress sought to "regulate more effectively interstate commerce in firearms so as to reduce the likelihood that they fall into the hands of the lawless or those who might misuse them," S. Rep. No. 89-1866, at 1 (1966), including "persons who are not criminals, but who commit sudden, unpremeditated crimes with firearms as a result of mental disturbances," 114 Cong. Rec. 21,829 (1968) (statement of Rep. Bingham). In passing amendments to this scheme, Congress has reiterated findings that shootings, including mass shootings, have been committed by persons with a history of mental illness. NICS Improvement Amendment Act of 2007, Pub. L. No. 110-180, § 2(8)-(9), 121 Stat. 2559-2560.

[8] The court so stated after conducting a means-end analysis no longer employed in Second Amendment cases, but its conclusions about the reasonableness of Congress's determinations remain valid, and in *Duarte* the court reaffirmed the constitutionality of categorical prohibitions on firearm possession.



**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

The fact of a person's prior commitment, which must be grounded in a finding of dangerousness, presumptively establishes a sufficient risk of future danger and firearms irresponsibility to support disarmament. *See Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 116 (1983) (observing that Congress in § 922(g)(4) "made no exception for subsequent curative events" and "obviously felt that" a person who "may be deemed cured and released" was nevertheless "too much of a risk to be allowed firearms privileges"). The Ninth Circuit has observed that "scientific evidence amply supports that congressional judgment," citing as one example a meta-analysis of multiple studies showing an "extraordinarily increased risk of suicide"—39 times higher than expected—for persons released from involuntary commitment. *Mai*, 952 F.3d at 1117; *see also id.* at 1118 ("Scientific studies show an ever-present increased risk of violence for those who were committed involuntarily, even well after they are released.").

In other words, § 922(g)(4) is the result of the legislature's reasoned assessment that a person who has been involuntarily committed to a mental institution—*i.e.*, where a court finds that the person is both mentally ill and dangerous such that involuntary confinement is necessary—poses enough of a threat to the safety of himself or others that he should generally not be allowed to possess a firearm. Congress could reasonably find that persons who at one time presented a danger sufficient to warrant involuntary commitment under current due process standards should have restricted access to machinery that can be used to perpetrate dangerous violent acts. A court-ordered involuntary commitment supplies sufficient evidence that the person committed is deemed dangerous.

Indeed, § 922(g)(4) arguably presents a stronger basis for categorical disarmament than the class of persons delineated in *Duarte* (*all* felons). Section 922(g)(4) applies to those who have been involuntarily committed after a court determined they were "*both* mentally ill *and* dangerous." *Mai*, 952 F.3d at 1110. But no such dangerousness determination is required for a



**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

felony conviction, and many felonies are non-violent and not inherently dangerous. Nevertheless, *Duarte* upheld § 922(g)(1)'s categorical, permanent disarmament of all felons because "our historical tradition reveals that legislatures were permitted to categorically disarm those they deemed dangerous without having to perform an individualized determination of dangerousness as to each person in a class of prohibited persons." 137 F.4th at 760 (internal quotation marks and citation omitted). It stands to reason that if a legislature can categorically disarm felons without individualized determinations of dangerousness, it necessarily can disarm a class of persons *all* of whom were, at some point, found by a court to be *actually* dangerous to themselves or others.

Post-*Bruen* authority squarely addressing § 922(g)(4) so far is scant, but what authority there is (the Fourth Circuit's decision in *Gould*) supports the government here. The *Gould* court concluded that the "how" of § 922(g)(4) "is disarmament, on pain of incarceration." 146 F.4th at 428. As to the "why," it explained that the "answer isn't simply firearm violence by the mentally ill." *Id.* (internal quotation marks and citation omitted). Rather, the "underlying societal problem" the statute aims to alleviate "is preventing violence by those found to pose an increased risk of danger to the community or themselves, and "[m]ental illness is *a* reason why someone may be deemed to be a threat to themselves or others." *Id.* The court found "support [for that 'how' and that 'why'] in two related historical traditions: the actions of legislatures and communities that *incapacitated* those suffering from mental illness when the afflicted posed a danger to themselves or others, and the accepted power of legislatures to disarm groups of people considered dangerous." *Id.* at 428-29. The court then described those historical traditions, and how they map on to § 922(g)(4). *Id.* at 428-33. Because the defendant in *Gould* brought only a facial challenge



**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

to the statute, the court expressed "no opinion on as-applied challenges" but concluded that "[i]t's not a stretch to find constitutional applications of § 922(g)(4) here."[9] *Id.* at 423, 434.

For the foregoing reasons, this Court, too, should find that § 922(g)(4) passes constitutional muster, and should grant the government's cross-motion for summary judgment.

**D. As-applied analysis is inappropriate, but § 922(g)(4) also is constitutional as to Mai**

This Court should categorically uphold § 922(g)(4) based on Congress's reasoned determination that persons who have been involuntarily committed "present a special danger of misuse of firearms." *Cf. Duarte*, 137 F.4th at 761 (internal quotation marks and citation omitted). Moreover, Congress, in 34 U.S.C. § 40915, has already created a judicial mechanism by which someone with a prior involuntary commitment can be relieved of a firearms disability. The Court should reject Mai's attempt to create a separate, parallel avenue for as-applied judicial challenges. But even if the Court does entertain this as-applied challenge, it should hold that § 922(g)(4) is constitutional as applied to Mai.

In § 40915, Congress set forth the factual findings required to obtain relief from § 922(g)(4) via judicial process. *Mai*, 952 F.3d at 1112. Mai cannot benefit under § 40915 because the "federal standard is more stringent than the Washington standard." *Id.* Washington's restoration statute does not qualify because it requires only a finding that a person "no longer presents a *substantial danger* to himself or herself, or the public," while federal law requires a determination that "the person will not be likely to act in a manner *dangerous* to public safety." *Id.* (quoting Washington and federal statutes). Moreover, Washington law lacks the required federal finding that granting "relief would not be contrary to the public interest." *Id.* (quoting

[9] The *Gould* court noted that West Virginia's firearms restoration statute comports with 34 U.S.C. § 40915, so "disarmament under § 922(g)(4) isn't categorically permanent in West Virginia." *Id.* at 432. The revitalization of § 925(c) means that although Washington's restoration statute does not relieve Mai from his federal firearms disability, that disability is no longer necessarily permanent.



**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

§ 40915). Washington's process does not result in the findings that Congress has made clear are necessary before Mai's federal ban can be lifted, but that is not a reason to create a separate regime of individualized as-applied exemptions independent of the mechanism Congress created. Mai's approach would be unsound in principle because it would bypass procedures put in place by Congress and distort the separation of powers.

It bears emphasis that Mai was involuntarily committed to a mental institution after a Washington state court found him to be "*both* mentally ill *and* dangerous." *Id.* at 1110. Mai "threatened himself and others," his "commitment lasted more than nine months," and it spanned his eighteenth birthday. *Id.* (footnote omitted). Mai may protest that the statute is unconstitutional as applied to him because his commitment was long ago, and a state court has since lifted his firearms disability under state law. While that suggests that Mai is not at present suffering a mental health crisis like the one that led to his commitment, it does not mean (as Congress has recognized) that he is not at higher risk of a future episode of threats of violence against himself or others.

**E. The restoration process under 18 U.S.C. § 925(c) will soon be available to Mai**

This Court should also decline to review Mai's contention that § 922(g)(4) is unconstitutional as applied to him because Congress has provided an avenue for seeking the restoration of gun rights in 18 U.S.C. § 925(c). While that provision had been moribund until recently, rulemaking is underway to establish a process for seeking the restoration of firearms rights under § 925(c). Mai should avail himself of that process when it becomes available rather than seeking a declaration that § 922(g)(4) is unconstitutional as applied to him.

Section 925(c) provides that a person who is disqualified from possessing firearms, including a person disqualified under § 922(g)(4), "may make application to the Attorney General for relief from the disabilities." 18 U.S.C. § 925(c). "[T]he Attorney General may grant such relief" if the applicant shows that "the circumstances regarding the disability, and the applicant's record



**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

and reputation, are such that the applicant will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest." *Id.* A person whose application is denied may seek judicial review in federal district court. *See id.*

Before 2025, that statutory authority had been delegated to ATF. *See United States v. Bean*, 537 U.S. 71, 74 (2002). Since 1992, however, appropriations statutes have included provisos prohibiting ATF from using appropriated funds to act on § 925(c) applications. *See id.* In combination, the delegation and the appropriations bar effectively suspended the program.

But the Attorney General, recognizing that the appropriations bar applies only to ATF, recently issued an interim final rule withdrawing the delegation of authority to ATF to administer § 925(c). *See Withdrawing the Attorney General's Delegation of Authority*, 90 Fed. Reg. 13,080 (Mar. 20, 2025). Then, in mid-July, the Department of Justice issued a Notice of Proposed Rulemaking "propos[ing] to implement criteria to guide determinations for granting relief from disabilities imposed by Federal laws." *See Application for Relief from Disabilities Imposed by Federal Laws with Respect to the Acquisition, Receipt, Transfer, Shipment, Transportation, or Possession of Firearms*, 90 Fed. Reg. 34,394 (July 22, 2025). The proposed rule requires that an applicant who has been adjudicated a mental defective or committed to a mental institution "will not be granted relief unless the applicant was subsequently determined by a court, board, commission, or other lawful authority to have been restored to mental competency, to be no longer suffering from a mental disorder, and to have had all rights restored." *Id.* at 34,404. Mai meets this requirement. And the rule is specifically designed for those, like Mai, who reside in states without federally qualifying restoration procedures. Indeed, the rule applies *only* to them because for applicants from states that have "adopted a relief-from-disability program implemented in accordance with 34 U.S.C. § 40915, the state program shall be the exclusive means of relief." *Id.*



**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

The comment period for the proposed rule closed on October 20, 2025. *Id.* at 34-394. The Department of Justice has already launched a page detailing its plan to "release an online application" after "the final rule is published." *See* https://www.justice.gov/pardon/ffrr (last visited November 18, 2025). By providing a mechanism through which those who have been involuntarily committed in the past can regain their ability to possess firearms, § 925(c) and this proposed regulation address any constitutional concerns about the duration of the restriction imposed on Mai by § 922(g)(4). For this reason, too, this Court should refuse to consider Mai's as-applied challenge.

Indeed, courts discussing potential constitutional concerns about the application of a firearms prohibition to a specific individual have suggested that making § 925(c) operational would alleviate those concerns. *See United States v. Williams*, 113 F.4th 637, 661 (6th Cir. 2024) (addressing § 922(g)(1) and noting that if § 925(c) were an available avenue, "it might provide disarmed felons the chance required by the Second Amendment to make an individualized showing of qualification to keep and bear arms" by addressing dangerousness criteria). The § 925(c) process that will be available to Mai when the Department issues a final rule—backstopped by the statutory right to judicial review of the denial of a § 925(c) petition—will soon provide Mai an opportunity to show that he should be permitted to possess a firearm even though he has been involuntarily committed. Because the near-term availability of that process means that Mai cannot show that he is subject to a permanent disability, his as-applied challenge should be denied.

## V. CONCLUSION

For the foregoing reasons, the United States respectfully asks this Court to deny Mai's motion for summary judgment, grant the government's cross-motion, and dismiss this action with prejudice in its entirety.



**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

DATED this 21st day of November, 2025.

Respectfully submitted,

CHARLES NEIL FLOYD
United States Attorney

*s/ Tania M. Culbertson*
TANIA M. CULBERTSON, WSBA No. 45946
ALIXANDRIA K. MORRIS, TX No. 24095373
REBECCA S. COHEN, WSBA No. 31767
Assistant United States Attorneys
United States Attorney's Office
Western District of Washington
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
Phone: 206-553-7970
Fax: 206-553-4067
Email: tania.culbertson@usdoj.gov
alixandria.morris@usdoj.gov
rebecca.cohen@usdoj.gov

*Attorneys for Defendant*

I certify that this memorandum contains 8,398 words, in compliance with the Local Civil Rules.